Jo Ann Niemi (SBN 020873)
**ANAPOL WEISS**
8700 E. Vista Bonita Drive, Suite 268
Scottsdale, Arizona 85255
Telephone: (480) 515-4745
Facsimile: (480) 515-4744
lcoben@anapolweiss.com
jniemi@anapolweiss.com
Minute Entries: ME@anapolweiss.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DARIA BRILL, ANDREA MORALES, and GALE ZYLSTRA, on Behalf of Themselves and All Others Similarly Situated, | CASE NO._____ |
| Plaintiffs, | |
| vs. | **CLASS ACTION COMPLAINT** |
| BANK OF AMERICA, N.A., and DOES 1-10, | JURY TRIAL DEMANDED |
| Defendants. | |

## **CLASS ACTION COMPLAINT**

Plaintiffs, Daria Brill, Andrea Morales, and Gale Zylstra, by and through undersigned counsel, on behalf of themselves and all persons similarly situated, complain and allege as follows on personal knowledge, investigation of counsel, and information and belief:

## NATURE OF THE CASE

1.      This is a civil action seeking monetary damages, restitution, declaratory relief, and injunctive relief from Bank of America, N.A. ("BofA") arising out of BofA's deceptive, fraudulent, and illegal scheme to exploit one of the most vulnerable groups imaginable – releasees from Arizona corrections facilities.

2.      If these individuals want *their own* money after they are released from prison, they are forced to accept a "consumer relationship" with BofA.  As a result of this relationship, BofA issues these individuals a debit card, in connection with which BofA charges them exorbitant and unusual fees once they are released from an Arizona corrections facility.  BofA refers to this card as the BofA CashPay Debit Card.  The fee structure for the BofA CashPay Debit Card, and other features devised by BofA, by turns dissuades and disincentivizes Arizona releasees from accessing their own money, and penalizes them with excessive or unusual fees when they do.

3.      BofA is the exclusive provider of debit cards issued to Arizona inmates upon their release from an Arizona corrections facility.  At the time of release, an Arizona releasee with a balance in her inmate account is forced to receive funds on a non-reloadable BofA debit card, the BofA CashPay Debit Card.

4.      When an Arizona inmate is released, they are supposed to receive a one-page form with a BofA CashPay Debit Card attached.  The one-page form simply contains instructions on how to activate the card.  The form does not describe any of the fees, or other terms and conditions, that govern the debit card's use.  Arizona releasees are never given an opportunity to review or agree to any terms and conditions governing the debit card's use prior to receiving it.  There is no period allowing for the withdrawal of funds so that releasees can enter into alternative banking or commercial arrangements that might be more favorable to releasees.

5.      If Arizona releasees want to use the BofA CashPay Debit Card to access their own money, they risk incurring numerous fees that ordinary consumers would never be charged.  For instance, there is a $15.00 fee *per transaction* at a bank teller

window.  There also is a $2.50 fee to speak with a customer service agent over the telephone.  If an Arizona releasee wishes to withdraw money at an ATM, there is a $1.50 charge by BofA for each withdrawal, even at an in-network ATM withdrawal (i.e., it costs $1.50 to withdraw money at a BofA ATM).  Not only do these and other fees dissuade or disincentivize Arizona releasees from using their debit cards (and accessing their own money), but to the extent these fees exceed the balance on a releasee's BofA CashPay Debit Card, the fees constructively prohibit unfettered access to one's own money.  For example, to "cash out" a balance in an amount that cannot be dispensed at an ATM machine, a releasee would incur a $15.00 window teller fee that could substantially diminish, or even exceed, the remaining balance on the card.

6.     The terms and conditions governing the above fees and other fees are not fully or adequately disclosed to Arizona releasees.  The fee schedule, in fact, is not disclosed on the activation instruction sheet that is supposed to accompany the BofA CashPay Debit Card.

7.     Further, confusingly, BofA's publicly available FAQ about CashPay Debit Cards issued to non-releasee consumers conflicts with the fees and other terms associated with CashPay Debit Cards issued to Arizona releasees.  For instance, BofA's publicly available FAQ states that cardholders may use their BofA CashPay Debit Cards "everywhere Visa debit cards are accepted . . . and at ATMs for any portion of your available balance as often as you like."  *See* Ex. A.  But, BofA neglects to mention that both in-network (and out-of-network) ATM withdrawals will incur a fee for Arizona releasees (unlike other consumers) attempting to use their BofA CashPay Debit Cards.  BofA also neglects to mention that not all ATMs can dispense below certain amounts, requiring the releasee to make a teller-assisted transaction and incur the window fee.  BofA also publicly claims that you can call the number on the back of the BofA CashPay Debit Card to ask questions, *see id.*, but fails to note that Arizona releasees (unlike other consumers) who do so will incur a fee.  Finally, the terms and conditions on BofA's publicly available website are not the same as the terms that purportedly govern Arizona releasees' CashPay Debit Cards.

3

8.      Arizona releasees are at the greatest risk and in the greatest need of support upon their release, as they re-acclimate themselves to living in society.  Every cent counts for releasees who are coming out of prison without an immediate means of income, or sometimes even a place to go.  BofA's array of unilaterally-imposed, undisclosed and/or inadequately disclosed, and unusual fees unfairly depletes Arizona releasees' funds for simple, routine transactions, at the exact time when these individuals need their money the most; indeed, BofA's scheme even dissuades Arizona releasees from accessing their own funds altogether.

9.      In sum, BofA's interference with Arizona releasees' possessory interest in their own money deprives Arizona releasees from their own money to which they are rightfully entitled.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BofA.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because BofA is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Arizona and in this District.

## THE PARTIES

12.      Plaintiffs Daria Brill, Andrea Morales, and Gale Zylstra are residents of Arizona.

13.      Defendant Bank of America, N.A. ("BofA") maintains its headquarters and principal place of business in Charlotte, NC.  BofA regularly and systematically conducts business throughout Arizona and this District, among elsewhere.  Among other things, BofA is engaged in the business of providing retail banking services, including

4

the issuance of debit cards, to millions of consumers, including Plaintiffs and members of the Class.

14.     Defendant Does 1-10, upon information and belief, are corporations, associations, individuals, or other legal entities that are currently unknown to Plaintiffs and represent the true names or capacities of the legal entities that execute, authorize, or are otherwise responsible for the conduct and damages alleged herein.

**COMMON FACTUAL ALLEGATIONS**

**A.     Arizona Releasees**

15.     There are over 40,000 inmates in the direct or indirect custody of the Arizona Department of Corrections at any given time, housed in approximately 16 corrections complexes.  The department releases more than 19,000 inmates each year.

16.     Any money an inmate may have possessed at the time of incarceration is placed into a custodial account while the inmate remains incarcerated at an Arizona corrections facility.  Subsequent funds may be deposited (or withdrawn) into this account while the inmate is incarcerated.  For example, an inmate may earn funds through work programs, or receive funds sent by friends or family.

17.     Any funds an inmate does not spend while incarcerated are the property of the inmate and returned upon release.

18.     Arizona releasees receive money they possessed while incarcerated on a debit card issued by BofA, which BofA refers to as the "CashPay Debit Card."  The terms of the BofA CashPay Debit Card are non-negotiable and not adequately disclosed. If Arizona releasees want to access their own money, they must accept the BofA CashPay Debit Card's terms.

19.     Arizona releasees are not given or otherwise made aware of the terms and conditions governing the BofA CashPay Debit Card prior to being released.  Upon being released, they are simply handed an envelope which contains a BofA CashPay Debit Card and activation instruction sheet.

**B.      BofA's Debit Card Monopoly**

20.      BofA imposes whatever terms and conditions it wishes on recipients of the BofA CashPay Debit Card.  BofA has perfected its scheme through two principal means.

21.      First, since at least 2012, BofA has been the exclusive issuer of debit cards to Arizona releasees.  By securing an exclusive arrangement, BofA has insulated itself from normal competitive market forces.

22.      Second, BofA exploits a current loophole in federal law that curbs banks' predatory practices designed to take advantage of debit cardholders. The Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.* and accompanying regulations, protect most consumers' rights in electronic funds transactions, including debit transactions. The primary purpose of the EFTA "is the provision of individual consumer rights."  15 U.S.C. § 1693(b).  By way of example, the EFTA and its enabling regulations make it illegal to require a consumer to receive payroll benefits (i.e., salary) in the form of a prepaid debit card, because the fees associated with accessing money loaded onto a debit card essentially reduce the total amount of money the consumer rightfully earned and to which she is rightfully entitled.

23.      However, the EFTA's current enabling regulations are ambiguous as to whether debit cards provided to releasees, such as the BofA CashPay Debit Card, fall within the regulations' ambit.  For instance, Regulation E defines a "payroll card account" as an account to which "electronic fund transfers of the consumer's wages . . . are made on a recurring basis."  12 C.F.R. § 1005.2(b)(2).  Some argue that the one-time payout of money a releasee accumulated while incarcerated is not a "recurring" fund transfer.[1]  The same has been argued about government benefits, such as SSA disability benefits or child support, issued via debit card.  In other words, current Regulation E does not expressly protect Arizona releasees or recipients of government benefits.

---

[1] *See, e.g.*, Prison Policy Initiative, Comments to Proposed Amendments to Regulation E (Mar. 18, 2015) (Ex. E).

24.     In December 2014, the Consumer Financial Protection Bureau ("CFPB") announced proposed amendments to Regulation E, to address in part perceived gaps or loopholes.  *See* 79 Fed. Reg. 77102 *et seq.* (Dec. 23, 2014).  One proposed amendment would provide additional protections to recipients of "government benefits" in the form of debit cards.  *See id.*

25.     Unfortunately, as currently proposed, the amendments to Regulation E would not classify releasees' receipt of their money on a BofA CashPay Debit Card as either a "government benefit" or a traditional consumer debit transaction (such as payroll benefits).

26.     Thus, even if Regulation E is amended, Arizona releasees who receive a BofA CashPay Debit Card will be one of the few subsets of consumers, if not the only subset, which are not protected by the EFTA.  This means that BofA may continue to exploit Arizona releasees who are forced to receive and use BofA CashPay Debit Cards if they ever want to access their own money.

### C.     Plaintiffs' Experience with the BofA CashPay Debit Card

#### 1.  Plaintiff Angela Morales

27.     Plaintiff Angela Morales was released from an Arizona corrections facility in July 2016.

28.     Upon her release, Ms. Morales was given a BofA CashPay Debit Card loaded with her money that she possessed or accrued while she was incarcerated.  She was not told the balance on her card.  A true and correct copy of the BofA CashPay Debit Card handed to her is attached as Ex. B.

29.     The debit card came with a sheet from BofA that explained how to activate the card, and an FAQ about what BofA does with cardholders' account information.  *See* Ex. C.

30.     In her instance, the debit card also came with a pamphlet entitled "Bank of America, Arizona Department of Corrections CashPay Visa / ATM Deposit Agreement."  *See* Ex. D.  Buried in the pamphlet is a "Schedule of Bank Fees," which is

excerpted (and enlarged) below:

| Arizona Department of Corrections CashPay® Visa Schedule of Bank Fees | |
|---|---|
| Bank Fees for Arizona Department of Corrections Prepaid Debit Card transactions will be charged to your Account as they occur on a daily basis. | |

| SERVICES WITH NO FEES | |
|---|---|
| **Purchase Transactions** | |
| Purchase at Visa Merchants (signed, using PIN, online, phone, or mail purchases) | No Fee |
| **ATM Transactions** | |
| ATM Balance Inquiries or Declined Transactions (all ATMs)** | No Fee |
| **Other Services** | |
| Online or Automated Customer Service Inquiry | No fee |
| Online Funds Transfer | No fee |

| SERVICES WITH FEES | |
|---|---|
| **ATM Transaction Fees *** | |
| ATM Withdrawal (all ATMs in the U.S.) | $1.50 per transaction |
| ATM Withdrawal (all ATMs outside the U.S.) | $3.50 per transaction |
| **Other Service Fees** | |
| Live Agent Customer Service Inquiry | $2.50 per call |
| PIN Change | No Fee for first change, $0.50 thereafter |
| Teller Cash Access (Available at financial institutions that accept Visa cards) (Limited to available balance only) | $15.00 per transaction |
| Card Replacement Domestic | $15.00 per replacement |
| Card Replacement - Express Delivery (additional charge) | $15.00 per request |
| Card Replacement (outside the U.S.) | Quote provided at time of request, as price varies by country |
| International Transaction | 3% of U.S. dollar amount of transaction |
| Check Issuance at Account Closure | $5.00 per request |

31.     Among the unusual fees is a $2.50 fee to speak with a BofA customer service agent via telephone, and a $15.00 per transaction fee for seeking window teller assistance at a BofA branch location.

32.     Ms. Morales has incurred at least one fee in connection with her BofA CashPay Debit Card, and/or was subjected to BofA's oppressive fees and other features in connection with the BofA CashPay Debit Card.

33.     When she first went to a BofA branch location to withdraw some money and to learn her balance (as it was not told to her upon release), the window teller could not tell her what the balance was on her card.  Ms. Morales subsequently made a second trip to withdraw some of her money and to learn her balance.  A different window teller was able to inform Ms. Morales about her balance.

8

## 2. Plaintiff Gale Zylstra

34. Plaintiff Gale Zylstra was released from an Arizona corrections facility in March 2016.

35. Ms. Zylstra was given a BofA CashPay Debit Card upon her release, which purportedly possessed the money she earned or accrued during her incarceration. Ms. Zylstra does not recall receiving any materials along with the BofA CashPay Debit Card.

36. Ms. Zylstra incurred at least one fee in connection with her BofA CashPay Debit Card, and/or was subjected to BofA's oppressive fees and other features in connection with the BofA CashPay Debit Card.

37. Ms. Zylstra who is confined to a wheelchair, put forth considerable effort to go to a Bank of America branch location to withdraw her money from the BofA CashPay Debit Card. The terms associated with the BofA CashPay Debit Card, including the fees, were particularly onerous to Ms. Zylstra. For instance, if she wished to check her balance by calling a live operator for convenience sake, she would be subject to a $2.50 per call fee.

## 3. Plaintiff Daria Brill

38. Plaintiff Daria Brill was released from an Arizona corrections facility in May 2016.

39. Upon her release, Ms. Brill was given a BofA CashPay Debit Card that purportedly contained the money she had possessed or accrued while she was incarcerated. She remembers the card being accompanied by a sheet explaining how to activate her card. Ms. Brill does not recall receiving any card agreement, or terms and conditions, along with the BofA CashPay Debit Card.

40. Shortly after her release, Ms. Brill sought to withdraw funds from her BofA CashPay Debit Card. Ms. Brill incurred at least one fee in connection with her BofA CashPay Debit Card, and/or was subjected to BofA's oppressive fees and other features in connection with the BofA CashPay Debit Card.

9

**D.    BofA Benefits from Its Wrongful Conduct**

41.    BofA significantly benefits from its fraudulent, deceptive, and unfair conduct.

42.    BofA charges releasees higher fees than they charge other consumers for identical services or transactions.  The below chart shows how the fees BofA charges releasees in connection with its CashPay Debit Card exceed those it charges ordinary consumers (see overleaf):

| Transaction Type | BofA "regular consumer" CashPay Debit Card[2] | BofA Inmate CashPay Debit Card[3] |
|---|---|---|
| Teller-Assisted Transaction | $0 | $15.00 |
| Live Agent Customer Service Telephone Inquiry | 1 waived each month, $1.50 for each additional call | $2.50 per call |
| International Transaction Fee | 2.00% | 3.00% |
| Card Replacement Fee – Domestic | 1 waived per year, $5.00 thereafter | $15.00 |
| ATM Withdrawal – Domestic | 1 waived per week at BofA ATMs, $1.50 for all others | $1.50 per transaction |

43.    In addition, BofA has provided other CashPay debit card services in Arizona, such as CashPay Debit Cards issued to Arizona state employees (i.e., the Arizona CashPay Payroll Card Program), or cards issued to state retirement system beneficiaries.  These cards feature fees and other terms that are more favorable to consumers than those associated with the BofA CashPay Debit Cards issued to Arizona

---

[2]  Bank of America, CashPay Card, Fee Information, *available at* https://prepaid.bankofamerica.com/cashpay/Program/Fee (last visited September 29, 2016).

[3]  Ex. F.

10

releasees.  In short, the BofA CashPay Debit Cards have the most onerous set of features among any similar type of debit card BofA issues in Arizona.

44.     Moreover, to the extent that BofA's fees represent substantial percentages of Class members' card balances – or worse, exceeds those balances (e.g., a releasee having to pay a $15.00 teller fee to withdraw a balance of $4.00), BofA's scheme dissuades Arizona releasees from using BofA CashPay Debit Cards at all, which results in the constructive forfeiture or non-use of Arizona releasees' own funds.

45.     Upon information and belief, most or all of the fees that BofA charges bear no relation to the actual costs borne by BofA.  For instance, there is no rational reason that making a withdrawal at a teller window, as opposed to an ATM, should cost a releasee (but not other consumers) $15.00.  Similarly, using a debit card at an in-network ATM (i.e., at a BofA ATM) normally does not result in a withdrawal fee.

46.     BofA has enriched itself at the Class members' expense by charging unfounded fees and erecting barriers to releasees' accessing their own money, and keeping that money for itself through constructive or actual forfeiture.

**E.     Class Members Are An Especially Vulnerable Group**

47.     Arizona releasees are among those individuals least able to afford the unusual and unfair fees, and an overall fee structure that dissuades and/or penalizes card use, which is thrust upon them by BofA.

48.     As one news outlet has reported, "experts say even small penalties can be both more significant – and more insidious – for newly released prisoners, who tend to have less money and banking experience, and face many other barriers to reintegrating into society."[4]  Companies like BofA can reap substantial profits on the backs of releasees because they can exploit a unique, "(literally) captive market."  *Id.*

---

[4]  Marketplace, "How big bank turn prisons into profit centers," Jan. 28, 2105, *available at* http://www.marketplace.org/topics/wealth-poverty/how-big-banks-turn-prisons-profit-centers (last accessed September 29, 2016).

49.     An Arizona releasee who leaves a corrections facility with nothing more than the clothes on her back and a BofA CashPay Debit Card in her hand has no choice but to pay BofA's fees to access his own money.  As one releasee subject to an analogous federal program soberingly put it, because of the unfair fees associated with a debit card thrust upon him, "I left prison with $120.  Because of the fees I was only able to use about $70 of it."[5]

## CLASS ALLEGATIONS

50.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

51.     The proposed class is defined as:

> All persons released from an Arizona corrections facility who, within the applicable statute of limitations preceding the filing of this action through class certification, were issued a BofA CashPay Debit Card.

Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

52.     Excluded from the Class is BofA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BofA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

53.     The members of the Class are so numerous that joinder is impractical.  The Class consists of many thousands of members, the identities of whom are within the

_____

[5] Al Jazeera America, "'Release cards turn inmates and their families into profit stream," Apr. 20, 2015, *available at* http://america.aljazeera.com/articles/2015/4/20/release-cards-turn-inmates-and-their-families-into-profit-stream.html (last accessed September 29, 2016).

12

knowledge of and can be ascertained only by resort to BofA's records.

54.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, were issued BofA CashPay Debit Cards upon their release from an Arizona corrections facility.  The representative Plaintiffs, like all Class members, have been damaged by BofA's misconduct in that they have been harmed by the same types of deceptive, misleading, and/or fraudulent pretenses and practices.  Furthermore, the factual basis of BofA's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

55.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

56.     Among the questions of law and fact common to the Class are whether BofA:

      a.     Wrongfully converted the funds of the Class;

      b.     Was unjustly enriched through the company's actions;

      c.     fraudulently concealed its past and ongoing wrongful conduct from Plaintiffs and other members of the Class (to the extent applicable); and

      d.     Violated consumer protection and other state laws.

57.     Other questions of law and fact common to the Class include:

      a.     The proper method or methods by which to measure damages; and

      b.     The declaratory and injunctive relief to which the Class is entitled, including but not limited to rescission or reformation.

58.     Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

59.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in

particular, class actions on behalf of consumers.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

60.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, the vulnerability of the class and the virtually unlimited financial resources of BofA, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and BofA's misconduct will proceed without remedy.

61.     Even if Class members themselves could afford such individual litigation, the court system could not.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COUNT ONE
## Unjust Enrichment

62.     Plaintiffs repeat the preceding paragraphs as if set forth fully herein.

63.     By means of BofA's wrongful conduct alleged herein, BofA knowingly and forcibly caused Plaintiffs and members of the Class to receive and to use the BofA CashPay Debit Card by or under fraudulent, unfair, deceptive, coercive, unconscionable, and/or oppressive means or conditions.

64.     BofA knowingly received and retained wrongful benefits from Plaintiffs and members of the Class.  In so doing, BofA acted intentionally or with conscious disregard for the rights of Plaintiffs and members of the Class.

65.     As a result of BofA's wrongful conduct as alleged herein, BofA has been

unjustly enriched at the expense, and to the detriment, of Plaintiffs and members of the Class.

66.     BofA's unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

67.     It is unfair and inequitable for BofA to be permitted to retain the benefits it received, and is still receiving, without justification, from the wrongful conduct alleged herein.

68.     The financial benefits derived by BofA rightfully belong to Plaintiffs and members of the Class, in whole or in part.  BofA should be compelled to account for and disgorge in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received from them, including but not limited to total disgorgement of all funds placed onto CashPay Debit Card accounts, and/or the amounts of fees incurred.  A constructive trust should be imposed upon all wrongful or inequitable sums received by BofA traceable to Plaintiffs and the members of the Class.

69.     Plaintiffs and members of the Class have no choice but to take the BofA CashPay Debit Card, and have no adequate remedy at law.

70.     BofA's fraudulent, unfair, deceptive, coercive, unconscionable, unilateral, and/or oppressive conduct amounts to an illusory promise, and/or demonstrates a lack of mutual consideration, rendering any agreement that may exist unenforceable, unconscionable, inequitable, void, or voidable.

## COUNT TWO
### Rescission

71.     Plaintiffs repeat the preceding paragraphs as if set forth fully herein.

72.     In the alternative to Count One, in the event a valid agreement is found to exist between BofA and members of the Class, and/or the placement of or access to balances on CashPay Debit Card accounts is not deemed to be improper, any such agreement should be rescinded.

73.     Consent by Plaintiffs and members of the Class to the terms governing the

1  BofA CashPay Debit Card, including the fee schedule and initial and continued

2  placement of funds on the cards, was not real or free, and/or was given under force,

3  mistake, duress, coercion, fraud, and/or without consent or mutual material

4  consideration.

5      74.   The terms governing the BofA CashPay Debit Card, including the fee

6  schedule and the initial and continued placement of funds on the cards, were not fully

7  disclosed to Plaintiffs and members of the Class.  Thus, Plaintiffs and members of the

8  Class lacked proper notice concerning such terms.

9      75.   The terms governing the BofA CashPay Debit Card, including the fee

10  schedule and the initial and continued placement of funds on the cards, contain

11  undisclosed, confusing, misleading, or abstruse conditions and terminology.  BofA

12  unilaterally drafted and imposed these fees and other terms on Plaintiffs and the Class,

13  which renders any agreement between BofA and Plaintiffs and members of the Class an

14  unenforceable contract of adhesion.

15      76.   Moreover, Plaintiffs and other members of the Class were forced or

16  induced to enter into any agreement governing the BofA CashPay Debit Card by fraud

17  or deceit, insofar as BofA misrepresented or omitted the full terms, nature, and fees

18  associated with the debit cards.  For example:

19      (i)   terms were not fully disclosed to Plaintiffs or members of the Class;

20      (ii)   money was placed and kept on the BofA CashPay Debit Cards

21      without consent and according to a scheme or structure that

22      dissuaded or disincentivized Plaintiffs' and Class members' use of

23      their own funds; and

24      (iii)   BofA representatives, at times, cannot even adequately or

25      accurately assist Class members with accessing or understanding

26      the amounts on the BofA CashPay Debit Cards.

27      77.   BofA intended, knew, or reasonably should have known, that

28  representations and omissions it has made and continues to make in connection with the

16

BofA CashPay Debit Card were materially false, deceptive, and misleading.

78.     As a direct and proximate result of BofA's conduct alleged herein, Plaintiffs and members of the Class believed, and reasonably so, that they had no choice to receive their money that was loaded on the BofA CashPay Debit Card than to accept and use the card.

79.     With any possible consent given only under force, mistake, fraud, coercion, duress, and/or oppression, as set forth above, Plaintiffs seek rescission of any allegedly valid agreement governing the BofA CashPay Debit Card and restitution for all fees incurred, or return of card balances, on behalf of themselves and members of the Class.

**COUNT THREE**
**Reformation**

80.     Plaintiffs repeat the preceding paragraphs as if set forth fully herein.

81.     In the alternative to Counts One and Two, in the event a valid agreement is found to exist between BofA and members of the Class, any such agreement should be reformed.

82.     Consent by Plaintiffs and members of the Class to the terms governing the BofA CashPay Debit Card, including the fee schedule and the initial and continued placement of funds on the cards, was not real or free, and/or was given under force, mistake, duress, coercion, fraud, and/or without consent or mutual material consideration.

83.     The terms governing the BofA CashPay Debit Card, including the fee schedule and the initial and continued placement of funds on the cards, were not fully disclosed to Plaintiffs and members of the Class.  Thus, Plaintiffs and members of the Class lacked proper notice concerning such terms.

84.     The terms governing the BofA CashPay Debit Card, including the fee schedule and the initial and continued placement of funds on the cards, contain undisclosed, confusing, misleading, abstruse conditions and terminology.  BofA

unilaterally drafted and imposed these terms on Plaintiffs and the Class, which renders any agreement between BofA and Plaintiffs and members of the Class an unenforceable contract of adhesion.

85.    Plaintiffs and other members of the Class were induced to enter into any agreement governing the BofA CashPay Debit Card, insofar as BofA misrepresented or omitted the full terms and true fees associated with the inmate debit cards.  For example:

(i)    terms were not fully disclosed to Plaintiffs or members of the Class;

(ii)   money was placed and kept on the BofA CashPay Debit Cards without consent and according to a scheme or structure that dissuaded or disincentized Plaintiffs' and Class members' use of their own funds;

(iii)  BofA representatives, at times, cannot even adequately or accurately assist Class members with accessing or understanding the amounts on the BofA CashPay Debit Cards.

86.    BofA intended, knew, or reasonably should have known, that representations and omissions it has made and continues to make in connection with the BofA CashPay Debit Card were materially false, deceptive, and misleading.

87.    BofA's fraud or bad faith is further evidence by its breach of the implied covenant of good faith and fair dealing.

88.    By common law or statute, the terms governing the BofA CashPay Debit Card impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

89.    Subterfuge and evasion violate the obligation of good faith in performance

even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

90.     BofA has breached the covenant of good faith and fair dealing through its wrongful actions alleged herein, through both affirmative misrepresentations and purposeful omissions, and Plaintiffs and members of the Class have suffered damages as a result.

91.     In addition, any agreement between BofA and Plaintiffs and members of the Class not only evidences BofA's fraud or bad faith as set forth above, but also accident or mistake.

92.     The same conduct set forth above could also demonstrate a mutual mistake, insofar as both sides to any agreement governing the terms of the BofA CashPay Debit Card would understand and believe that deposits could be made.  In addition, both sides to any agreement were mutually mistaken insofar as BofA representatives have been unable to report balances or facilitate transactions.  This reveals a potential misunderstanding of each other's intent based on the terms governing the relationship, to the extent that such a relationship is found to have been validly formed.  Further, mutual mistakes were relied on by BofA and Plaintiffs and members of the Class.

93.     Accordingly, to the extent the releasees and BofA have entered into any form of an agreement, the agreement should be reformed with reasonable and fair terms that are specific and determinable.

94.     As a direct and proximate result of BofA's conduct alleged herein, Plaintiffs and members of the Class believed, and reasonably so, that they had no choice to receive their money that was loaded on the BofA CashPay Debit Card than to accept and use the card.

## COUNT FOUR
### Conversion

95.     Plaintiffs repeat the preceding paragraphs as if set forth fully herein.

96.     BofA had and continues to have a duty to maintain and preserve the funds of Plaintiffs and members of the Class, and to prevent their diminishment through their own wrongful acts.

97.     By placing Plaintiffs' and Class members' funds into BofA inmate debit card accounts without consent, failing to inform them of material terms, making it difficult to understand the fees associated with those accounts, charging unusual fees in connection with the BofA CashPay Debit Card, and creating a scheme that dissuades or disincentivizes use of one's own money, BofA has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and Class members without legal justification.

98.     BofA has wrongfully asserted possession, collected fees, or created a scheme and circumstances that dissuades or disincentivizes use of one's own money from Plaintiffs and members of the Class.  BofA has taken specific and readily identifiable funds from their accounts in payment of such fees in order to satisfy them.

99.     BofA continues to retain these funds unlawfully and without the consent or Plaintiffs or other members of the Class.

100.    BofA intends to permanently deprive Plaintiffs and the Class of these funds.

101.    These funds are properly owned and identifiable by Plaintiffs and members of the Class, not BofA.  Yet, BofA now claims that it is entitled to the funds' ownership or control, contrary to the rights of the Plaintiffs and members of the Class.

102.    Plaintiffs and the members of the Class are entitled to immediate possession of these funds.  BofA have wrongfully converted these specific and readily identifiable funds.

103.    As a direct and proximate result of this wrongful conversion, Plaintiffs and

members of the Class have suffered and continue to suffer damages.  BofA's wrongful conduct is continuing.

104.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from BofA all damages and costs permitted by law, including all amounts that BofA have wrongfully converted.

**COUNT FIVE**
**Arizona Consumer Fraud Act**

105.    Plaintiffs repeat the preceding paragraphs as if set forth fully herein.

106.    The Arizona Consumer Fraud Act, § 44-1521, *et seq.* prohibits the "use or employment . . . of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression, or omission."

107.    BofA has engaged in practices violative of the Arizona Consumer Fraud Act, as alleged herein.  For example, Plaintiffs and members of the Class obtained unwanted and unrequested services in the form of debit card services.  BofA engaged in unlawful conduct, made affirmative misrepresentations or omissions, or otherwise violated the Arizona Consumer Fraud Act by, inter alia, knowingly, intentionally, recklessly and negligently misleading Plaintiffs and members of the Class about the terms, fees, and other features or conditions associated with the BofA CashPay Debit Card.

108.    Further, BofA has violated the Arizona Consumer Fraud Act by forcing releasees into this disadvantageous relationship.  If inmates want to access their own money, they are required to use a BofA CashPay Debit Card, and to be subjected to the deceptive or unfair fees, terms, and structure that dissuades or disincentivizes use.

109.    To the extent applicable, BofA intended that Plaintiffs and other members of the Class would rely on the company's misrepresentations, or acts of concealment and omissions, including those in connection with the BofA CashPay Debit Card terms or

fee schedule.  Further, to the extent applicable, reliance can be presumed under the circumstances.

110.    BofA's conduct proximately caused Plaintiffs and members of the Class to suffer palpable injury, including but not limited to transaction-related fees that would otherwise not have been incurred in whole or in part, and the dissuasion or disincentive to use one's own money due to the structure and nature of the BofA CashPay Debit Card program.

111.    As redress for BofA's repeated and ongoing violations, Plaintiffs and the Class are entitled to, inter alia, damages and declaratory or injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class demand a jury trial on all claims so triable and judgment as follows:

1.    Declaring BofA's conduct alleged herein to be fraudulent, deceptive, wrongful, unfair, inequitable, and unconscionable;

2.    Restitution owing to Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

3.    An accounting and disgorgement of the ill-gotten gains derived by BofA's misconduct, including but not limited to BofA's relinquishment of any funds properly possessed or owed to Plaintiffs and the Class;

4.    Actual damages in an amount according to proof, including double or treble damages to the extent permitted by law or equity;

5.    A temporary and permanent injunction enjoining BofA from engaging in the same wrongful conduct going forward;

6.    Punitive and exemplary damages;

7.    Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

8.    Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees;

9.      Rescission of the agreement between the parties;

10.     Reformation of the agreement between the parties; and

11.     Such other relief as this Court deems just and proper.


DATED this  3ʳᵈ  day of November, 2016.

                                    ANAPOL WEISS



                                      /s Jo Ann Niemi
                                    Jo Ann Niemi
                                    *Attorney for Plaintiffs*


                                    GOLOMB & HONIK, P.C.
                                    Ruben Honik (*pro hac vice pending*)
                                    David J. Stanoch (*pro hac vice pending*)
                                    1515 Market Street, Suite 1100
                                    Philadelphia, PA 19102
                                    Phone:      (215) 985-9177
                                    Fax:    (215) 985-4169
                                    Email: rhonik@golombhonik.com
                                           dstanoch@golombhonik.com